**Opinion filed March 5, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00263-CV

_____

## IN THE INTEREST OF R.R.L., A CHILD

**On Appeal from the 446th District Court**
**Ector County, Texas**
**Trial Court Cause No. E24044PC**

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from the trial court's order terminating the parental rights of the mother and father of R.R.L.[1]  *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2024).  Both parents appealed.  We affirm the trial court's order.

### *Mother's Appeal*

The mother's court-appointed counsel has filed a motion to withdraw and a supporting brief in which he professionally and conscientiously examines the record and applicable law and concludes that the appeal presents no arguable issues and is

---

[1]We use initials to refer to the child.  *See* TEX. R. APP. P. 9.8(b).

therefore frivolous and without merit. The brief meets the requirements of *Anders v. California*, 386 U.S. 738 (1967), by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See In re Schulman*, 252 S.W.3d 403, 406–08 (Tex. Crim. App. 2008); *High v. State*, 573 S.W.2d 807, 812 (Tex. Crim. App. [Panel Op.] 1978).

Counsel has provided the mother with a copy of the brief, a copy of the motion to withdraw, copies of the clerk's record and reporter's record, and a letter explaining her right to review the record and file a pro se response to counsel's *Anders* brief. *See Kelly v. State*, 436 S.W.3d 313, 318–20 (Tex. Crim. App. 2014). The mother has not filed a response.

We conclude that the mother's appellate counsel has satisfied his duties under *Anders*, *Kelly*, and *Schulman*. Following the procedures outlined in *Anders* and *Schulman*, we have independently reviewed the record in this case, and we agree that the mother's appeal is frivolous and without merit.

In light of the Texas Supreme Court's holding in *In re P.M.*, however, an *Anders* motion to withdraw "may be premature" if filed in the court of appeals under the circumstances presented in this case. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) ("[A]n *Anders* motion to withdraw brought in the court of appeals, in the absence of additional grounds for withdrawal, may be premature."). The court in *P.M.* held that, in parental termination cases, court-appointed counsel's duty to his or her client generally extends "through the exhaustion of [all] appeals." *Id.* at 27–28. In this regard, "appointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *Id.*

Accordingly, we deny counsel's motion to withdraw, and we affirm the trial court's order of termination as to the mother.

*Father's Appeal*

In five issues on appeal, the father challenges the sufficiency of the evidence to support the trial court's findings that he committed the predicate grounds for termination listed in Sections 161.001(b)(1)(D), (E), (N), and (O)[2] of the Family Code, and that termination of his parental rights was in the child's best interest. *See* FAM. § 161.001(b)(1)(D), (E), (N), (O), (b)(2).

A. *Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. § 161.001(b). To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1), and that termination is in the best interest of the child. *Id.* Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that the father:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child;
>
> (N) constructively abandoned the child who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services (the Department) for not less than six months, and despite the Department's reasonable efforts to return the child to the father, he did not

---

[2]The legislature amended Section 161.001(b)(1) and repealed subsection (O) effective September 1, 2025. *See* Act of May 16, 2025, 89th Leg. R.S. ch. 211, §§ 2, 4, 2025 Tex. Sess. Law Serv. 573, 574–76; *In re D.M.*, No. 11-25-00102-CV, 2025 WL 2980658, at *1 n.2 (Tex. App.—Eastland Oct. 23, 2025, no pet.) (mem. op.). The amendments only apply to suits affecting the parent-child relationship that were pending on or after the effective date of the amendments. *Id.* § 3. Thus, we apply the law in effect at the time the suit was pending below.

3

regularly visit or maintain significant contact with the child, and demonstrated an inability to provide the child with a safe environment; and

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the child, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal under Chapter 262 for abuse or neglect.

*See id.* § 161.001(b)(1)(D), (E), (N), (O). The trial court further found that termination of the father's parental rights was in the child's best interest. *See id.* § 161.001(b)(2).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (first quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); and then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d

4

17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied).

With respect to the best interest of the child, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best interest finding, the Department is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence indicates that

the parent-child relationship and the parent's conduct has endangered the safety and well-being of the child. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the child, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of a parent's parental rights is in the child's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the child may recur in the future if the child is returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Moreover, the factfinder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness by the parent to meet the child's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

B. *The Evidence Presented at Trial*

When R.R.L. was born in August 2024, the Department intervened due to concerns that the parents failed to address in their previous case. In the previous case, the mother's and father's first child together, H.S., died in January 2024 when he was three months old. When H.S. was born, the Department was already involved with the mother and her oldest child. The mother was permitted to bring H.S. home

with her and the family began participating in family-based safety services (FBSS).[3] The father did not live with the mother, but frequently went to her home to see H.S. Prior to H.S.'s death, the father was informed by the Department of the dangerous conditions in the mother's home. He expressed his own concerns about the home but made no effort to improve H.S.'s living conditions. The mother and father also tested positive for illegal substances throughout the FBSS case and were arrested for committing domestic violence against each other in October 2023. The mother was suspected to have rolled onto H.S. while co-sleeping. The FBSS case was closed following H.S.'s death.

The Department contacted the parents at the hospital soon after R.R.L. was born. In February 2024, while the mother was pregnant with R.R.L., she tested positive for cocaine and marihuana. The father submitted to drug testing following R.R.L.'s birth, the results of which were positive for "high levels" of cocaine and marihuana.

Department investigator Christy Reyes assessed the mother's home prior to R.R.L.'s discharge from the hospital. She was not let inside the first time she went to the home, but observed that the front yard was messy, there was a broken front window that was boarded up, and she could smell urine and feces coming out of the home when she knocked on the front door. The second time she went to the home, she was let inside and could tell "somebody ha[d] been cleaning the home" because she smelled "a mixture of cleaning product, . . . feces[,] and urine." "[T]he ceiling in the living room had come down" and was missing sheetrock. There were "wet patterns" on the kitchen ceiling "as if the roof [was] leaking," and Reyes worried

---

[3] "Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department." 40 TEX. ADMIN. CODE ANN. § 700.710 (2021). The Department's Child Protective Services Division provides family-based safety services to families and children "to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.*

that it was about to cave in. There was clutter throughout the house and holes in the walls, the shower was broken, and the bathroom sink had never been cleaned. Reyes also noticed the smell of marihuana.

Notwithstanding H.S.'s death and persisting dangers in the mother's home, the father intended for R.R.L. to live with the mother. Because of the potential danger to R.R.L. were she released to the parents, the Department sought and was granted temporary managing conservatorship of R.R.L. on August 23, 2024.

The Department created a family plan of service for the father in October 2024 that the trial court approved and adopted as an order of the court. As part of the father's service plan requirements, he was ordered to:

- maintain stable income and appropriate housing that is a safe environment for the child, and permit his caseworker access to his home;

- maintain monthly contact with the Department and provide any changes in address, contact information, or household members within five days;

- complete parenting classes;

- complete a drug and alcohol assessment, a mental health assessment, and a psychological evaluation;

- submit to random drug screens;

- participate in individual counseling and anger management; and

- attend supervised visits with R.R.L.

R.R.L. was placed in a foster home where she remained until the final termination hearing on July 18, 2025. According to Cynthia Warren, the supervisor of R.R.L.'s Court Appointed Child Advocate (CASA), R.R.L. was doing well there.

The trial court held the final termination hearing on July 18, 2025 and took judicial notice of the entire court's file, including the father's service plan. In addition to Warren, the father testified, followed by Reyes, Department caseworker Sherry Mitchell, and Teresa Valero, the father's counselor.

Mitchell testified that the father has only submitted to drug testing four times since R.R.L. was born. After testing positive for cocaine and marihuana in August 2024, the father ignored his caseworker's monthly directives to submit to drug testing; his next drug screen was in January 2025 when the trial court explicitly ordered him to do so during a hearing. In January, April, and July 2025, the father tested positive for marihuana. He also failed to attend parenting classes, domestic violence classes, his mental health assessment, and his drug and alcohol assessment.

The father did not dispute that he failed to comply with his service plan requirements and continued using marihuana while the case was pending. He conceded that he did not attend domestic violence classes, never scheduled his drug and alcohol assessment, missed his scheduled mental health assessment, and failed to complete his counseling and anger management obligations.

The father testified that he "reached out to [the Department] multiple times" about setting up visitation and never received a response. He could not remember the last visit he had with R.R.L. but claimed to have attended three in-person visits and six or seven virtual visits. However, Mitchell refuted the father's assertion and stated that he missed all but one virtual visit with R.R.L. And the Department showed the father text messages between him, his caseworker, and the visitation supervisor arranging his weekly virtual visitation, then removing them from the schedule due to his lack of attendance.

Valero testified that she and the father had two counseling sessions before he stopped attending. During their first session, the father got "really angry[] because[R.R.L.] was not placed with him," and "was adamant that he does not need . . . 'to go through this,' regarding his classes." The father told Valero that he was still smoking marihuana, and described his service plan requirements as, "quote, 'b------t.'" During their second session, the father became defensive about his marihuana use, asserted that "the passing of [H.S.] was not his fault, and that [the

9

Department] took his daughter from the hospital[] without talking to him, and that's what makes him angry." When they discussed H.S.'s passing and the safety issues in the mother's home, Valero concluded that the father minimized the dangers in the home and failed to grasp the potential harm to R.R.L. if she were permitted to stay with the mother. The father again became defensive—"he did not feel he needed to prove himself, since he takes care of his other kids, and he's not with [the mother]."

The father has two other children besides R.R.L.—a three-year-old and a newborn son—who do not live with him. The Department opened an investigation into the father's infant son and the mother of that child, which was pending at the time of the final hearing. The father testified that he is only paying his court-ordered child support for his three-year-old even though he is obligated to pay child support for R.R.L. as well. However, Mitchell testified that the father has not provided financial assistance or any other support for R.R.L., such as diapers, food, formula, and her other needs.

The father quit his job a month before the final hearing and has been helping his grandfather "build[] and flip[] houses" since then. According to Mitchell, the father did not inform her that he quit working at his previous places of employment; the father told her in April 2025 that he was working at Subway and Walmart. The father likewise failed to timely inform Mitchell of changes to his phone number and address. Upon receiving his new phone number, Mitchell attempted to contact him and directed him to submit to drug testing at least once a month, and had attempted to see his residence multiple times to no avail. Then, a few days before the final hearing, Mitchell learned that the father had moved to a different address without informing her.

At the conclusion of the hearing, the trial court terminated the father's parental rights to R.R.L. pursuant to Section 161.001(b)(1)(D), (E), (N), and (O), and found

termination to be in the best interest of the child. *See* FAM. § 161.001(b)(1)(D), (E), (N), (O), (b)(2). This appeal followed.

C. *Section 161.001(b)(1)(D) and (E) – Endangerment*

In his first and second issues, the father challenges the trial court's findings that he endangered the child. *See id.* § 161.001(b)(1)(D), (E). Although only one statutory ground is necessary to support termination, appellate courts must address a parent's challenges to a trial court's findings under subsections (D) or (E), as they may have implications for the parent's rights to other children. *See id.* § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (addressing due process and due course of law considerations with respect to appellate review of grounds (D) and (E) and holding that an appellate court must provide a detailed analysis if affirming the termination on either ground). Thus, if we conclude that the evidence is legally and factually sufficient to uphold the trial court's finding as to either subsection (D) or (E), we need not address the remaining subsections. *See* FAM. § 161.001(b)(1); TEX. R. APP. P. 47.1. And when the evidence pertaining to both subsections (D) and (E) is interrelated, as it is here, we may conduct a consolidated review of the trial court's endangerment findings. *See In re A.L.S.*, 660 S.W.3d 257, 263–64 (Tex. App.—San Antonio 2022, pet. denied); *In re J.D.*, 436 S.W.3d at 114; *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).

The statutory endangerment grounds require clear and convincing proof that the parent has: "(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," or "(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." FAM. § 161.001(b)(1)(D), (E); *In re S.M.R.*, 434 S.W.3d 576, 585 (Tex. 2014). "[E]ndangerment encompasses a larger array of conduct that 'expose[s a

11

child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The term means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012), but "does not require actual harm," *R.R.A.*, 687 S.W.3d at 277 (citing *Boyd*, 727 S.W.2d at 533).

To terminate a parent's rights for endangerment under Subsections (D) or (E), the "parent's endangering conduct need not 'be directed at the child,'" nor must "the child actually suffer[] injury." *R.R.A.*, 687 S.W.3d at 277 (quoting *Boyd*, 727 S.W.2d at 533); *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024). "[T]ermination under [subsection] (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment." *C.E.*, 687 S.W.3d at 310. "A parent's drug use, violence, or other abuse may make the child's environment endangering to the child." *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.). "A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk." *Id.* Because conditions or surroundings cannot endanger a child unless the child is exposed thereto, the relevant time frame for evaluating subsection (D) is before the child's removal. *J.W.*, 645 S.W.3d at 749.

Endangerment under subsection (E), in contrast, focuses on the parent's conduct, and whether the endangerment of the child's well-being was the direct result of the parent's acts, omissions, or failures to act. *In re J.S.*, 687 S.W.3d 541, 550 (Tex. App.—Eastland 2024, no pet.). Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's

12

physical or emotional well-being." *R.R.A.*, 687 S.W.3d at 277. A parent's actions prior to and after the child's removal may show an endangering course of conduct. *See J.S.*, 687 S.W.3d at 550 ("[E]ndangering conduct may include a parent's actions before the child's birth and may relate to the parent's actions while the parent had possession of other children."). "Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being." *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (Illegal drug use and offenses that occurred before the child's birth may be considered as part of a course of conduct that endangers a child.).

The father emphasizes on appeal that he never had custody of R.R.L. and thus could not have endangered her. However, "a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment." *J.W.*, 645 S.W.3d at 749. "[H]olding otherwise would effectively endorse a parent's willful ignorance of the significant risk that a pregnant mother's drug use poses." *Id.* at 750. In this regard, "a parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re M.K.V.*, 648 S.W.3d 478, 486 (Tex. App.—San Antonio 2021, no pet.) (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)). The mother tested positive for cocaine and marihuana in February 2024, approximately six months before R.R.L. was born and presumably while she was pregnant with her. The father also tested positive for "high levels" of cocaine and marihuana soon after R.R.L.'s birth. During the FBSS case, both parents tested positive for illegal substances. Thus, the evidence of both parents' years of drug use

13

and positive drug test results permit the reasonable inference that the father was aware of the mother's drug use during her pregnancy with R.R.L. *See* FAM. § 161.001(b)(1)(D).

The father likewise contends that he was not at fault for H.S.'s death because the child was living with the mother. In doing so, he ignores the well-established law that failing to remove a child from an endangering environment can support termination under subsection (D) if the parent is aware of the dangerous conditions or surroundings. *See J.G. v. Tex. Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Moreover, courts may look to a parent's treatment of other children in the family in deciding whether that parent engaged in a course of conduct that endangered the child. *See Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.). The father admitted that he was aware of the dangerous conditions in the mother's home prior to H.S.'s death, yet never improved the child's living conditions or moved him into his own apartment—instead, he intended to permit R.R.L. to live with the mother in the same dangerous conditions and surroundings.

Moreover, the evidence permits the rational inference that the parents' tumultuous relationship involved physical violence. Police responded on multiple occasions after neighbors called and reported the parents' loud fighting, which resulted in their arrests for domestic violence. The father likewise confirmed that the mother was arrested while this case was pending for assaulting the father's pregnant girlfriend, and that she previously got into an altercation with his mother. *See In re D.J.W.*, 624 S.W.3d 60, 67 (Tex. App.—El Paso 2021, no pet.) ("[D]omestic violence may support a finding of either environmental or course-of-conduct endangerment."). Such evidence substantiates rather than undermines

the trial court's finding that the father knowingly subjected R.R.L. to a life of uncertainty and instability that endangered her well-being. *See In re M.S.*, 662 S.W.3d 620, 630–31 (Tex. App.—Beaumont 2023, pet. denied) (In addition to "domestic violence concerns," the father left his children with the mother "when he knew something was wrong with her."); *In re K.G.*, No. 11-24-00236-CV, 2025 WL 477650, at *5–6 (Tex. App.—Eastland Feb. 13, 2025, no pet.) (mem. op.) ("A parent's decision to leave a child in the care of a known drug user subjects the child to a life of uncertainty and instability that endangers the child's physical and emotional well-being."); *E.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *9 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op.) (The father endangered the child by leaving the child with the mother, whom he knew to be a methamphetamine user.).

Finally, despite the father's argument that he could not have endangered R.R.L. without ever having custody of her, "[a] parent's missed visits with a child and his failure to complete a service plan can support an endangerment finding because such conduct 'generally subjects a child to a life of instability and uncertainty.'" *In re A.L.S.*, 660 S.W.3d 257, 273 (Tex. App.—San Antonio 2022, pet. denied) (quoting *In re A.R.M.*, 593 S.W.3d 358, 371 (Tex. App.—Dallas 2018, pet. denied)). The father showed clear disinterest by failing to attend all but one visit with R.R.L. We therefore conclude that a reasonable factfinder could form a firm belief or conviction that the father knowingly allowed R.R.L. to remain in endangering conditions before she was born, and continued to engage in a course conduct that endangered R.R.L. *See* FAM. § 161.001(D), (E). The evidence is therefore legally and factually sufficient to support the trial court's findings under subsections (D) and (E).

Accordingly, we overrule the father's first and second issues. Because the evidence is legally and factually sufficient to support at least one predicate finding

under Section 161.001(b)(1), we need not consider the father's third and fourth issues challenging the trial court's findings under subsections (N) and (O). *See* TEX. R. APP. P. 47.1; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

D. *Best Interest of the Child*

The father also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in the best interest of the child. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Giving the requisite due deference to the trier of fact, we hold that, based on the evidence in the record and the application of the *Holley* factors, the trial court could have formed a firm belief or conviction that termination of the father's parental rights was in R.R.L.'s best interest. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of evidence regarding some of these factors does not preclude a best interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.) (quoting *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *6 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.)). Consequently, "evidence relating to one single factor may be adequate in a particular situation to

16

support a finding that termination is in the best interest[] of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). And evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of a child's best interest. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (citing *C.H.*, 89 S.W.3d at 28). In this regard, evidence that the father endangered and constructively abandoned R.R.L. could be considered by the factfinder in determining whether termination was in the child's best interest. *See E.C.R.*, 402 S.W.3d at 249–50; *C.J.O.*, 325 S.W.3d at 266.

First, the trial court could consider the father's persistent marihuana use in its best interest determination. A parent's continuing pattern of drug use can support a best interest finding due to the "attendant risks to employment, housing, and prolonged absence from the child[]." *R.R.A.*, 687 S.W.3d at 279–281; *see also In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) (parents' years of drug use supported trial court's best interest finding). Consequently, a parent's drug use "implicates most of the *Holley* factors." *In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied).

R.R.L. turned eleven months old on the day of the final hearing. When children are too young to express their desires, the factfinder may consider whether the children have bonded with their caregivers, are well-cared for by them, and whether the children have spent minimal time with a parent. *In re E.J.M.*, 673 S.W.3d 310, 334 (Tex. App.—San Antonio 2023, no pet.); *see also In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (evidence showing that a young child had bonded with foster family supported a best interest finding). The evidence shows that R.R.L. is doing well in her foster home, that the father never visited her in person, and that the father only participated in a single virtual visit. The father's repeated disregard for the well-being of R.R.L. demonstrates a pattern of parental indifference, which "supports a finding that

17

termination of parental rights is in a child's best interest under every one of the *Holley* factors." *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *see also In re J.A.R.*, 696 S.W.3d at 257 ("Stability and permanence are paramount in the upbringing of children."). He ignored nearly every directive from his caseworker to submit to drug testing, missed all but one of his weekly virtual visits with R.R.L., failed to maintain communication with the Department, and failed to complete most of his service plan requirements. The father's clear disinterest "poses an emotional and physical danger to the child" now and in the future and shows the father's unwillingness or inability to meet his child's needs now and in the future. *A.J.D.-J.*, 667 S.W.3d at 823; *see Holley*, 544 S.W.2d at 371–72.

The factfinder may also compare the parent's and the Department's plans for the children and determine whether the plans and expectations are realistic or weak and ill-defined. *In re U.G.G.*, 573 S.W.3d 391, 402 (Tex. App.—El Paso 2019, no pet.). The father points to the lack of a permanent placement for R.R.L. However, while "[e]vidence about placement plans and adoption are, of course, relevant to best interest," a "lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor." *C.H.*, 89 S.W.3d at 28; *J.S.*, 687 S.W.3d at 553. Otherwise, terminations would regularly be subject to reversal on the sole ground that "an adoptive family has yet to be located." *C.H.*, 89 S.W.3d at 28; *see also In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Warren testified that R.R.L. was doing well in her foster home and exhibited "no long-term behaviors or concerns" despite "being born early and potentially with some illegal substances in her" system. The Department's recommendation to terminate the father's parental rights was rationally based on his failure to demonstrate the ability to provide R.R.L. with a safe, drug-free home environment or adequately parent the child. *See U.G.G.*, 573 S.W.3d at 402 ("In

reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children."). Therefore, we conclude that the trial court properly found that this factor does not weigh against a best interest finding and termination of the father's parental rights. *See C.H.*, 89 S.W.2d at 28; *F.M.E.A.F.*, 572 S.W.3d at 732.

Rather than recognizing his role in R.R.L.'s removal, the father characterized himself as the aggrieved party. He ignored the evidence of his aggression and obstinance, and imputed fault to the mother and the Department for the circumstances. The father refused to engage in services or regularly submit to drug screens and continued using marihuana while the case was pending. He also insisted that his required classes and counseling were unnecessary. The trial court could consider the father's minimization of culpability, his failure to truly avail himself of the programs to assist him in promoting the best interest of the child, and his failure to properly address the Department's concerns in its determination. *See Holley*, 544 S.W.2d at 371–72; *In re A.H.*, No.11-24-00075-CV, 2024 WL 3879987, at *7 (Tex. App.—Eastland Aug. 21, 2024, pet. denied) (mem. op.) ("[Mother's] past behavior, minimization of her conduct, drug use . . . and failure to properly address and treat her mental health issues[] permit the rational conclusion that relinquishing [the child] to her care would pose a substantial risk of harm to the child."). The record therefore discloses several circumstances from which the trial court may have reasonably discerned a "pattern of conduct that is inimical to the very idea of child-rearing." *J.F.-G.*, 627 S.W.3d at 316 (quoting *C.H.*, 89 S.W.3d at 28); *Holley*, 544 S.W.2d at 371–72. Accordingly, the father's acts and omissions indicated that the existing parent-child relationship was not a proper one, which supports the trial court's best interest finding. *See Holley*, 544 S.W.2d at 371–72.

Upon considering the evidence as it relates to the father's actions and inactions, the emotional and physical danger to the child now and in the future, the

emotional and physical needs of the child now and in the future, the father's lack of parental abilities and stability, and the father's drug use, we hold that the evidence is legally and factually sufficient to support the trial court's findings that termination of the father's parental rights is in the best interest of the child. *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72.

Accordingly, we overrule the father's fifth issue on appeal.

*This Court's Ruling*

We affirm the order of the trial court.


W. BRUCE WILLIAMS

JUSTICE


March 5, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.